AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the
_____ District of _____

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | Case No.   1:25-mc-00578 |
| *or identify the person by name and address)* | ) | |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❏ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| | |

The application is based on these facts:

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:   6/18/2025   _____

_____
*Judge's signature*

City and state:   _____

_____
*Printed name and title*

## CONTINUATION PAGES FOR AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been since so employed since October 2020.  I am a graduate of the Federal Law Enforcement Training Center and ATF National Academy.  I obtained a Bachelor's degree in Business Administration from Millersville University in Millersville, Pennsylvania.  Prior to joining ATF, I was employed as a police officer with the Manheim Borough Police Department and Baltimore City Police Department.

3.    I am currently assigned to the ATF Philadelphia Field Division, Harrisburg Field Office, comprised of ATF Special Agents whose primary responsibilities include the investigation of individuals or groups who have committed violations of the federal firearms, explosives, and narcotics laws. I have written, participated in, and acquired knowledge of the execution of search warrants.

4.    The information in this affidavit is known to me personally or has been relayed to me by other law enforcement officers, or individuals assisting law enforcement officers, as indicated below. Because I submit this affidavit for the limited purpose of securing authorization to search the property described herein, I have not included every fact known to me concerning this investigation. I only submit those facts and circumstances that establish probable cause to support the issuance of the requested search warrant.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.    The property to be searched is an Apple iPhone, with a floral case (the "Device").

6.    The Device is currently in the ATF's custody at the ATF Harrisburg Field Office in Harrisburg, Pennsylvania.

7.    The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically-stored data particularly described in Attachment B.

**PROBABLE CAUSE**

8.    On or about November 29, 2019, Nicole CRAMER purchased a .380 cal Taurus Spectrum (S/N 1F124222) and a .40 cal Taurus G2C (S/N SMU77387) from Hakes Sporting Goods in Wrightsville, Pennsylvania.  On the ATF Form 4473, CRAMER provided an address of 126 Perry Street, Columbia, Pennsylvania 17512 and phone number (717) 621-1450.  A receipt from Hakes Sporting Goods showed that CRAMER paid in cash and did not buy ammunition or firearm accessories.

9.    On or about January 25, 2020, CRAMER purchased a 9mm Smith and Wesson M&P Shield (S/N JHH8190) from Hakes Sporting Goods in Wrightsville, Pennsylvania. On the ATF Form 4473, CRAMER provided address 64 South Federal Street, Apartment 2, Chambersburg, Pennsylvania 17201 and phone number (717) 621-1450. A receipt from Hakes Sporting Goods showed that CRAMER paid in cash and did not buy ammunition or firearm accessories.

3

10.   On or about January 27, 2020, Elizabethtown Borough Police conducted a traffic stop on a black 2004 Chevrolet Trailblazer, Pennsylvania registration KPM 9650, for an inoperable passenger-side brake light.   CRAMER was the driver, and her boyfriend, Damir Maxfield, was in the front-passenger seat.

11.   While speaking with Maxfield, officers smelled marijuana coming from inside the vehicle.  Maxfield later admitted having a small bag of marijuana in the glove box.  CRAMER admitted that she had a firearm inside the vehicle and did not have a Pennsylvania concealed carry permit. The firearm was discovered between the center console and front passenger seat. It was a .380 cal Taurus Spectrum (S/N 1F124222). The firearm did not have a magazine inserted, and a round was not in the chamber; however, a loaded magazine that fit the firearm was inside a tied-up Sheetz bag behind the front passenger seat. No arrests were made, but the marijuana was seized and the firearm returned to CRAMER.

12.    On or about February 4, 2020, York City Police stopped a dark blue Chrysler 200 sedan, Pennsylvania registration ICZ 0662, for a window-tint violation. The driver was Brianya Latayza Hickman-Watson, and the front seat passenger was Sheldon Small.

13.    During that traffic stop, officers smelled marijuana coming from inside the vehicle and determined that Hickman-Watson did not possess a valid driver's license. Small, a convicted felon, admitted that he had a firearm on his person and possessed a small bag of marijuana. The firearm was a .40 cal Taurus G2C (S/N SMU77387), which CRAMER purchased and did not report stolen. Hickman-Watson's mother picked her up.  Law enforcement arrested Small for drug and firearm violations.

14.    Based on an ATF National Integrated Ballistic Information Network report, the firearm that Small possessed was possibly linked to shootings in York, Pennsylvania, which occurred on December 15, 2019 (three people including a juvenile were shot), and February 1, 2020 (unoccupied vehicles shot).

15. Approximately two days after Small was arrested, on or about February 6, 2020, CRAMER called the Chambersburg Police to report that two of her firearms went missing on January 30, 2020. The firearms CRAMER reported were a black Smith and Wesson (S/N SMU77387) and a black 9mm Springfield (S/N JHH8190). CRAMER further said that she had been residing in Chambersburg, Pennsylvania, with her brother, but moved back to Columbia, Pennsylvania, on January 30, 2020. CRAMER stated that she had packed her belongings, including the firearms, into her vehicle, which she kept unlocked, and parked in the garage at the property she was residing at in Chambersburg, Pennsylvania. CRAMER advised that she moved back to Columbia, Pennsylvania the same day that she packed her belongings into her vehicle. CRAMER also asked whether she could be responsible if a crime was committed with the firearms.

16. Officers with the Chambersburg Police Department interviewed CRAMER's brother, Christopher Garrison. According to Garrison, CRAMER moved out before January 30, 2020. Garrison also said that CRAMER and Maxfield never kept their vehicle unlocked and did not park in the garage; instead, Garrison parked in the garage.

Garrison additionally acknowledged that he and Maxfield were convicted felons.

17.    The firearm information that CRAMER provided to the Chambersburg Police Department did not match the firearms that she had purchased. The firearm with serial number SMU77387 was the .40 cal Taurus G2C, and the firearm with serial number JHH8190 was the 9mm Smith and Wesson M&P Shield.

18.    On or about February 07, 2020, York City Police Detective Paul DeHart interviewed CRAMER. Beforehand, Detective DeHart requested CRAMER to bring the .380 cal Taurus Spectrum (S/N 1F124222) – the firearm CRAMER possessed during the traffic stop on or about January 27, 2020.  CRAMER complied.

19.    During the interview with Detective DeHart, CRAMER stated that Maxfield and his cousin, Anthony Holley, accompanied CRAMER when she purchased the Taurus firearms on or about November 29, 2019, at Hakes Sporting Goods. CRAMER stated that she attempted to purchase the firearms with a debit card belonging to Maxfield; however, Hakes Sporting Goods refused to accept a card in the name of a person different from the buyer. Maxfield gave CRAMER

7

cash to make the purchase, which is corroborated by the receipt obtained by Hakes Sporting Goods. CRAMER additionally admitted knowing that Maxfield was a convicted felon.

20.    During the same interview with Detective DeHart, CRAMER advised that Holley accompanied her when she purchased the Smith and Wesson firearm on or about January 25, 2020. CRAMER stated that she paid for the firearm with "tax return" money; though, the Internal Revenue Service did not begin accepting and processing 2019 tax returns until approximately January 27, 2020.

21.    CRAMER proceeded to tell Detective DeHart that, on or about January 24, 2020, she discovered the .40 cal Taurus G2C (S/N SMU77387) and 9mm Smith and Wesson M&P Shield (S/N JHH8190) were missing. CRAMER further stated that she kept both firearms, as well as the .380 cal Taurus Spectrum (S/N 1F124222) inside the glovebox of her Chevrolet Trailblazer. According to CRAMER, she kept her Chevrolet Trailblazer unlocked to avoid broken windows in the event somebody wanted to break in. However, CRAMER did not purchase the 9mm Smith and Wesson M&P Shield (S/N JHH8190) until on or about January 25, 2020.

22.    CRAMER told the Chambersburg Police Department that the black Smith and Wesson (S/N SMU77387) and black 9mm Springfield (S/N JHH8190) were missing on January 30, 2020. But she told the York City Police that they were missing on January 24, 2020. Additionally, CRAMER stated that she kept three of her firearms in the glove box of her vehicle that she kept unlocked. But she only reported two firearms missing to Chambersburg Police and never mentioned a third firearm. CRAMER voluntarily relinquished that third firearm, i.e., the .380 cal Taurus Spectrum (S/N 1F124222), to the York City Police on February 7, 2020. Furthermore, one of the firearms that CRAMER reported stolen and claimed that she put in her vehicle on January 30, 2020, was potentially involved in two shootings in York City, on December 15, 2020, and February 1, 2020.

23.    CRAMER also stated that she lived in Chambersburg, Pennsylvania when she purchased the 9mm Smith and Wesson M&P Shield (S/N JHH8190) at Hakes Sporting Goods on or about January 25, 2020. Yet, CRAMER's address in Chambersburg, Pennsylvania was more than 1.5 hours away from Hakes Sporting Goods.

9

24.    On or about November 30, 2024, CRAMER purchased a 9mm Strassells Machine C9 (S/N P10210700) from Sportsman's Warehouse, in Camp Hill, Pennsylvania.   On the ATF Form 4473, CRAMER provided an address of 103 Stratford Drive, Red Lion, Pennsylvania 17356 and phone number (267) 780-8049.   On the Pennsylvania Record of Sale form, CRAMER did not provide employment information.  A receipt obtained from Sportsman's Warehouse showed that CRAMER paid with a debit card belonging to Billie Graham and did not purchase ammunition or firearm accessories. Graham was CRAMER's mother and a person not to possess a firearm.

25.    Video footage of the purchase was obtained from Sportsman's Warehouse.  It showed CRAMER arrive at the store with two children.  Shortly after arriving, CRAMER met with a black male who was already inside the front entrance of the store.  CRAMER went to the gun-sales area and purchased a firearm. While that was happening, the black male interacted with CRAMER and the children on several occasions but walked away while CRAMER completed the firearm paperwork. When CRAMER paid for the firearm, the black male came back over to her. And once the transaction was complete, the

black male walked over to the ammunition section with a store employee. The black male and store employee had a conversation in front of the ammunition while CRAMER watched. The black male eventually pulled a box of ammunition off the shelf and showed it to the store employee before walking towards the cash register. Another conversation happened between the store employee and the black male, resulting in the store employee pulling a different box of ammunition and taking it to the cash register.  At the register, CRAMER appeared to have paid for the ammunition in a separate transaction while the black male stepped away from the cash register and interacted with the children.  Once the transaction was complete, CRAMER, the black male and children left the store together.

26.    On or about February 03, 2025, CRAMER purchased a .22 cal GSG Firefly (S/N F517397) from Sportsman's Warehouse, in Camp Hill, Pennsylvania. On the ATF Form 4473, CRAMER provided address 103 Stratford Drive, Red Lion, Pennsylvania 17356 and phone number (267) 780-8049. On the Pennsylvania Record of Sale form, CRAMER did not provide employment information. A receipt obtained from Sportsman's Warehouse showed that CRAMER paid with a debit card

belonging to "Visa Cardholder" and did not purchase ammunition or firearm accessories.

27.    Video footage of the purchase was obtained from Sportsman's Warehouse. It showed CRAMER, a black male, and children get out of a maroon sedan and walk into Sportsman's Warehouse together. Inside, CRAMER, the black male, and the children went to the gun-sales area. The black male was on his cell phone and distanced himself from CRAMER when a store employee started interacting with her. The male came back, however, once CRAMER started to fill out the firearm paperwork. The black male also picked up what appeared to be a Streamlight box from one of the accessory racks and eventually put it in the shopping cart that CRAMER was using. Streamlight is a company that makes different flashlights including kinds that can be mounted on a firearm. At no point during the firearm transaction did CRAMER look at, or interact with, firearm accessories. Once the transaction was completed, CRAMER, the children, and the black male left the store together. While walking to their vehicle, the black male took the Sportsman's Warehouse shopping bag from CRAMER.

28.    On or about February 10, 2025, East Hempfield Township Police responded to Women and Babies Hospital, located at 690 Good Drive, Lancaster, Pennsylvania 17601, for a report of a stolen license plate. Graham had discovered the license plate to CRAMER's 2008 Ford Taurus, Pennsylvania registration MLE 3352, was removed from the vehicle while it was parked in the parking lot overnight. Additionally, Graham discovered that two firearms were missing from the vehicle and a broken laptop was in the trunk.

29.    According to CRAMER, who spoke with law enforcement in her assigned hospital room, the firearms were a .380 Hi Point (S/N P8189884) and a .22 German Sports Gun (S/N F517397). CRAMER stated the two missing firearms were kept in the driver-side door pocket while the loaded magazines for the firearms were kept in the front-passenger side-door pocket. CRAMER advised that the only person who knew about the firearms in her vehicle was her boyfriend, Homanie LYONS. Per CRAMER, LYONS had been her boyfriend for approximately four months and was not the father of the child that CRAMER gave birth to at Women and Babies Hospital.  CRAMER advised that LYONS briefly drove the vehicle the previous night and

13

had been in and out of her hospital room, on the phone. CRAMER stated that LYONS eventually left the hospital with his brother to go back home, in Gaithersburg, Maryland.

30.    On or about February 15, 2025, CRAMER contacted East Hempfield Township Police to advise that she was contacted by LYONS who stated his ex-girlfriend, "Lulu," had been with him in the parking lot of Women and Babies Hospital on February 9, 2025. According to CRAMER, LYONS said that "Lulu" stole the license plate and two firearms.  LYONS also said that "Lulu" threatened to stab LYONS if he told CRAMER.

31.    "Lulu" was later identified as Lillith REEDY, date of birth January 2, 1998.

32.    An investigative query revealed that a white 2019 GMC Terrain, VIN: 3GKALMEV7KL116961, Pennsylvania registration LDG 7139, was registered to REEDY and Linda Reedy, at 568 South Franklin Street, Wilkes Barre, Pennsylvania 18702.

33.     On or about February 27, 2025, I reviewed video footage from Women and Babies Hospital in Lancaster, Pennsylvania. The video started on February 10, 2025, at approximately 0242 hours. The footage was from a camera angle showing the front entrance to Women and Babies Hospital and a wide-angle view of the parking lot. At approximately 0242 hours, a white SUV pulled into the parking lot and parked one row behind CRAMER's vehicle, a maroon Ford Taurus. A large portion of the Taurus was obstructed from view due to a silver SUV blocking a large portion of the Taurus.  A female, dressed in dark clothing, got out of the driver seat of the white vehicle and walked over to CRAMER's vehicle.  The female dropped down by, what appeared to be, the front driver side area of the vehicle. At approximately 0249 hours, a male dressed in dark clothing exited the front entrance to Women and Babies Hospital and walked over to CRAMER's vehicle while the female was still there.  Both the male and female appeared to go to the trunk of CRAMER's vehicle.  The male took several items from CRAMER's vehicle and put them in the white SUV.  At approximately 0256 hours, the male and female entered the white SUV and drove away.

34.    On or about March 8, 2025, officers with the Wilkes Barre Police Department responded to Scheil's Family Market, located at 30 Hanover Street, Wilkes Barre, Pennsylvania, for a report of an active shooter.

35.    It was determined that REEDY, a home-health aide for Yvonne George, had brought George to Scheil's Family Market for a grocery order that George had made. REEDY transported George to Scheil's Family Market in the above-referenced white 2019 GMC Terrain that was registered to REEDY and Linda Reedy.

36.    Video footage from Sheil's Family Market showed a grey Ford sedan follow REEDY's vehicle in the parking lot before parking near the back of the lot. A short while later, REEDY got out of the GMC Terrain and walked towards the entrance of Sheil's Family Market. A male, later identified as Sahann Graha, exited the Ford Fusion and approached REEDY. An altercation took place between REEDY and Sahann, where REEDY pushed Sahann away from her and ultimately pulled out a firearm and discharged several rounds. Sahann

ran away.  Sahann also pulled a firearm and discharged several rounds towards REEDY.

37.    Law enforcement recovered a 9mm Glock 19 (S/N CCXL830), with a suspected machinegun conversion device attached, a 9mm Smith and Wesson Shield (S/N JMY3743), and a .22 cal GSG Firefly (S/N F517397).

38.    Sahann possessed the Glock.

39.    REEDY possessed the Smith and Wesson.  The GSG Firefly was in her car and had been reported stolen by CRAMER.

40.    On or about March 13, 2025, Wilkes Barre Police Detective James Conmy and Luzerne County Detective George Kiefer interviewed REEDY, with her attorney present. During the interview, REEDY advised that she had an on-and-off again relationship with LYONS for about four years.  REEDY stated that LYONS was from the Wilkes Barre, Pennsylvania area; however, LYONS resided in Maryland. REEDY further advised that she believed LYONS was a person not to possess firearms due to schizophrenia and mental-health related issues. REEDY also advised that LYONS was known to possess firearms and carry one on his person, in a cross-body bag.

41.     When law enforcement asked REEDY about the incident at Women and Babies Hospital in East Hempfield Township, REEDY said that CRAMER delivered a baby that did not belong to LYONS; however, CRAMER wanted LYONS to be present to sign the birth certificate. REEDY stated that LYONS called her when he was at the hospital with CRAMER and asked REEDY to pick him up. REEDY admitted to driving from Wilkes Barre, Pennsylvania to Women and Babies Hospital to pick up LYONS.  At the hospital, REEDY stated that she got out of her vehicle while LYONS retrieved several bags from CRAMER's vehicle and put them in her vehicle. REEDY advised she did not know that LYONS took two firearms from CRAMER's vehicle when she picked him up at the hospital.  But REEDY stated that she later got into an argument with LYONS after arriving back in Wilkes Barre on an unknown date.  Per REEDY, LYONS left two firearms with her that belonged to CRAMER.  REEDY stated that LYONS left one firearm in the center console of her vehicle and the other one at her residence. REEDY claimed that she did not know what to do with the firearms, but knew CRAMER purchased them both for LYONS. REEDY admitted touching both firearms and stated that she attempted to give the

firearms back to LYONS; though, according to REEDY, LYONS did not want them because CRAMER bought him more firearms.

42.    REEDY stated that LYONS told her CRAMER bought firearms for him and has bought firearms for other people, including the father of her first child. REEDY admitted there may be messages between her and LYONS discussing CRAMER purchasing firearms for LYONS on her cell phone. REEDY further admitted that she may have deleted the messages.

43.    REEDY knew the stores that CRAMER and LYONS went to and approximately how much they paid for the firearms. REEDY stated that each firearm purchased was more than $100. REEDY stated that LYONS has asked her in the past to purchase firearms for him, but she said that she is not dumb and that is why LYONS got somebody else (CRAMER) to do it.

44.    REEDY advised that LYONS gave CRAMER money to purchase firearms through Cash App and accompanied CRAMER to pick out the firearm for purchase.    REEDY stated that one of the firearms was recently purchased around LYONS' birthday. Per REEDY, CRAMER's birthday gift to LYONS was putting the firearm in her name.

45.    Records from Cash App for CRAMER's account are consistent with REEDY's statements about LYONS paying money to CRAMER through Cash App on dates near CRAMER's purchase.    The amount of money that LYONS paid CRAMER through Cash App were also close in proximity to the amount that CRAMER paid for said firearm purchase.

46.    REEDY stated that she did not get along with CRAMER because of her relationship status with LYONS.    Furthermore, REEDY admitted calling CRAMER on an unknown date and recording the conversation.    This statement was corroborated by call-detail records that showed phone number (267) 780-8049 (associated with CRAMER) calling phone number (570) 472-7152 (associated with REEDY). And phone number (267) 780-8049 received a call from (570) 472-715 on or

about March 9, 2025 – the day after the shooting at Shiel's Market in Wilkes Barre, Pennsylvania.

47.    Additionally, during the interview, REEDY told law enforcement that she possessed another firearm that belonged to CRAMER.  REEDY wished to turn the firearm over to law enforcement.  But REEDY did not want law enforcement at her residence in Plymouth, Pennsylvania.  Law enforcement agreed to meet REEDY at the Plymouth Police Station, where REEDY turned over a 9mm Hi-Point C9 (S/N P10210700).  That firearm was registered to CRAMER and not reported stolen.

48.    Based on my training and experience, I know that people who possess stolen firearms and traffic firearms use their cellular telephones to plan, coordinate, and execute both the commission of the crime and the concealment of the crime.  More specifically, I know that people who engage in firearm trafficking communicate with straw purchasers, fellow firearm traffickers, and firearm customers to facilitate the firearm-trafficking activities. Based upon my training and experience, I know that firearm traffickers will have more than one cellular phone to avoid detection by law enforcement and to distance

themselves from incriminating evidence. There is probable cause to believe the Device will likely contain text messages, call logs, photographs, or other data directly related to straw purchasing and firearms trafficking.

49.    Based upon my training and experience, I know that people who are in romantic relationships or friendships communicate with each other on cellphones via text message, email, and other electronic means, and that a search of the Device will reveal evidence of these relationships, the context and purpose of their relationship, and their location.

50.    Based upon my experience and training, there is probable cause to believe that searching REEDY's cell phone will provide evidence of her relationship and involvement with LYONS and CRAMER, as well as REEDY's knowledge of and involvement in straw purchasing and trafficking of firearms with LYONS and CRAMER.  In addition, REEDY's cell phone may contain other information to include text messages, call logs, photographs, or other data directly related to firearms trafficking and may aid law enforcement in identifying any co-conspirators.

51.    The Device is currently in the custody of the ATF, at the ATF Harrisburg Field Office, in Harrisburg, Pennsylvania.

52.    In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the ATF.

53.    While the ATF might already have all necessary authority to examine the Device, I seek a search warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

## TECHNICAL TERMS

54.    Based on my training and experience, I use the following technical terms to convey the following meanings:

> a. <u>Wireless telephone</u>: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone

numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  <u>Digital camera</u>:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  <u>Portable media player</u>:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  <u>GPS</u>: A GPS navigation device uses the Global Positioning System to display its current location.  It often contains

records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. <u>PDA</u>: A personal digital assistant ("PDA") is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f. <u>IP Address</u>: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four

25

numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

55.    Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. As well, I know that the Device can access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

56.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Device. This information can sometimes be recovered with forensics tools.

57.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

58. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

28

59. *Manner of execution*. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## BIOMETRIC UNLOCK

60. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock the Device pursuant to this warrant. I seek this authority based on the following:

> a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

> b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or

her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. The passcode or password that would unlock the Device subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the

Device, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is reasonably believed by law enforcement to be a user of the Device, to unlock the

31

Device using biometric features in the same manner as discussed above.

h. Due to the foregoing, if the Device may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is reasonably believed by law enforcement to be a user of the Device, to the fingerprint scanner of the Device; and, (2) hold the Device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the Device in order to search its contents as authorized by this warrant.

## **CONCLUSION**

61.   I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## ATTACHMENT A

The property to be searched is an Apple iPhone with floral case (the "Device"). The Device is currently in the custody of the ATF, at the ATF Harrisburg Field Office, in Harrisburg, Pennsylvania.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.    All records on the Device described in Attachment A that relate to violations of 18 U.S.C. §§ 371 (Conspiracy) and 933 (Trafficking in Firearms) and involve Nicole CRAMER, Homanie LYONS, and Lillith REEDY, including:

a.  Communications about acquiring, distributing, possessing, purchasing, selling, trading, or trafficking any firearm, ammunition, or firearm accessory;

b.  Depictions (including photographs and videos) of any firearm, ammunition, or firearm accessory;

c.  Depictions (including photographs and videos) of any store or location where firearms can be lawfully purchased, traded, or otherwise acquired;

d.  Call and message logs;

e.  Types and prices of firearms distributed, purchased, or trafficked, as well as dates, places, and amounts for specific transactions;

f.  Browser history and Internet searches related to any firearm, ammunition, or firearm accessory;

g. GPS data; and,

h. All bank records, checks, credit card bills, account information, and other financial records related to the sale, distribution, or purchase of any firearm, ammunition, or firearm accessory.

2.    Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.    During the execution of the search of the Device, law enforcement personnel are authorized to (a) press or swipe the fingers (including thumbs) of any individual, who is reasonably believed by law enforcement to be a user of the Device, to the fingerprint scanner of the device; and / or (b) hold the Device in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the Device in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.